**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

United States of America,

      Plaintiff

v.

Lawrence J. Semenza II, et al.,

      Defendants

Case No.: 2:22-cv-02059-JAD-NJK

**Findings of Fact, Conclusions of Law, and Final Judgment Following Bench Trial**

Former United States Attorney Lawrence J. Semenza II owes nearly $1.3 million in criminal restitution and tax assessments after pleading guilty to not paying years of taxes. The United States contends that Lawrence has continued to avoid his tax liability by dissipating his assets through his relatives. So the United States sues Lawrence, his late wife's estate, and his step-son Phillipe Schaad, alleging that Lawrence improperly transferred the Semenzas' former home to Schaad shortly after his sentencing to place this asset beyond the government's reach.

After Chief U.S. District Judge Andrew P. Gordon entered summary judgment against the Semenzas, this case proceeded to a bench trial solely on whether the government's then-unrecorded tax liens entitled it to the proceeds from Schaad's now-sold home. The government presented three theories at trial: that the liens can apply directly to Schaad because he was not a "purchaser" protected from unrecorded liens, that the transfer was a "legal fiction" because Schaad only nominally owned the property for the Semenzas, and that the transfer was actually or constructively fraudulent and can effectively be set aside.

Because the government did not successfully rebut Schaad's contention that he paid adequate consideration for the home, I reject the government's theories that Schaad was the

Semenzas' nominee, that the transfer was constructively fraudulent, or that the government could have directly attached the liens to Schaad's interest in the property. But I find that Lawrence fraudulently conveyed the home to frustrate tax-collection efforts and his intent to do so is sufficient to prove an actually fraudulent conveyance. So I award the government the excess equity in the home along with the amount the Semenzas purportedly paid in rent to Schaad. I award Schaad the remainder.

## Background

**A.      Mr. Semenza agreed to pay back taxes as part of a plea agreement.**

Lawrence J. Semenza II[1] served as the United States Attorney for this district in the 1970s and worked in private practice afterwards.[2] Lawrence had previously studied tax law and prosecuted tax and asset-dissipation cases.[3] But Lawrence often did not pay taxes on his earnings in the ensuing decades, culminating in a criminal investigation in the 2010s.[4] That investigation resolved in August 2014 when the United States charged Lawrence under 26 U.S.C. § 7203 with three counts of failing to file a tax return for 2007, 2008, and 2009.[5] That same day, Lawrence signed a plea agreement admitting that "as a licensed attorney he knew that he had a legal duty" to timely file and pay taxes and he had "acted willfully" in failing to do so.[6]

---

[1] Because Lawrence's late wife Romie Semenza was a party to this case and her estate still is, ECF No. 98, I refer to each Semenza individually by their first name for clarity. No disrespect is intended by doing so.

[2] ECF No. 120 at 153:10–24, 154:17–155:10, 156:16–18.

[3] *Id.* at 152:10–23, 154:6–156:16, 155:11–156:15.

[4] *See* ECF No. 133 at 3.

[5] *Id.*

[6] *Id.*; Plaintiff's exhibit (Pl. Ex.) 46.

That plea agreement forbade Lawrence from transferring his property without consideration.[7] The court scheduled sentencing for January 14, 2015.[8]

That December, Lawrence's wife Romie Semenza traveled to Switzerland to visit her son and Lawrence's stepson, Phillipe Schaad—who was a citizen and resident of Switzerland at the time.[9]  The Semenzas and Schaad were close, typically celebrating Christmas together.[10]  But around that Christmas, Romie informed Schaad that Lawrence had been criminally investigated for tax evasion, pled guilty, and would be sentenced.[11]  Schaad submitted a letter in support of a lenient sentence.[12]  On January 16, 2015, the court entered judgment, sentencing Lawrence to eighteen months in prison and ordered him to pay restitution of $290,009.[13]

**B.     The Semenzas quitclaimed their home to Schaad.**

Schaad and the Semenzas then moved quickly.  Within the next two weeks, Schaad decided to purchase the Semenzas' home and completed the transaction by January 30, 2015.[14] Schaad claims to have spoken with a family-friend realtor[15] and he informally researched similar properties on real-estate websites.[16]  But Schaad and the Semenzas forwent many of the usual steps: they did not seek an appraisal, work with a title company, inspect the home, do a public

---

[7] Pl. Ex. 46 at 11.

[8] ECF No. 133 at 3.

[9] *See* ECF No. 169 at 113:1–114:25, 121:21–122:5.  While Schaad remains a Swiss citizen, he now lives in Portugal.  *Id.* at 114:17–25.

[10] *See id.* at 115:21–116:13.

[11] *Id.* at 121:21–122:5; ECF No. 170 at 31:15–35:10.

[12] ECF No. 169 at 115:21–23.

[13] ECF No. 133 at 3; ECF No. 120 at 196:4–200:8.

[14] Joint Ex. 3; ECF No. 169 at 124:17–125:24; ECF No. 170 at 31:23–33:24.

[15] The government questions whether this conversation ever happened.  ECF No. 173 at 5.

[16] *See* ECF No. 170 at 35:11–36:9.

records search, or seek an informal valuation of the property.[17]  Critically, a record search would have revealed that two days before Schaad's purchase, the Department of Justice (DOJ) had recorded a restitution lien against the property.[18]

Lawrence transferred title to Schaad with a quitclaim deed.[19]  The quitclaim deed valued the property at $412,675—the outstanding portion of the originally $460,200 mortgage.[20] Lawrence estimated his home's worth to be around $450,000 at this time.[21]  Schaad did not assume the mortgage but testified at trial that he agreed to pay it off to receive the home.[22]

The Semenzas paid the home's mortgage for the next two months, but on April 9, 2015, Schaad paid the mortgage off for $415,715.[23]  The funds were transferred from a Swiss-based account held by Schaad.[24]  Schaad testified that he had recently inherited these funds from his biological Swiss father,[25] and that it took two months because he needed to return to Switzerland to arrange the funds' transfer.[26]

At trial, Schaad stated that his motivation for buying the home was to help the Semenzas out and to give his mother a place to live while Lawrence was incarcerated.[27]  He also claimed

---

[17] ECF No. 169 at 127:12–137:23; ECF No. 171 at 7:20–8:4.

[18] Joint Ex. 2.

[19] Joint Ex. 3.

[20] *Id.*

[21] ECF No. 120 at 218:15–220:21.

[22] *See* ECF No. 169 at 132:5–8; ECF No. 170 at 25:8–10, 32:1–13, 33:17–24.

[23] Joint Ex. 10; ECF No. 170 at 36:11–25.

[24] *See* Joint Exs. 5, 10; ECF No. 170 at 36:11–25.

[25] *See* Joint Ex. 1; ECF No. 169 at 117:11–25; ECF No. 170 at 30:10–31:5.

[26] *See* ECF No. 170 at 34:20–35:2.

[27] ECF No. 170 at 31:23–33:24.

that he viewed the home as an investment.[28]  In his 2016 debtor examination, Lawrence testified that he transferred the home because his mortgage, taxes, and utilities exceeded $5,000 a month, and he believed he would be unable to afford them while incarcerated.[29]  But the government points out that the Semenzas had more than enough money to continue paying these costs while Lawrence was incarcerated—including having been paid $1 million a little over a year earlier.[30]

**C.     The Semenzas continued living at the property.**

The parties agree that the Semenzas continued to live on the property without a written rental agreement after the transfer.  But they offer two competing narratives of the Semenzas' arrangement with Schaad.  Schaad contends that they had an unwritten agreement in which the Semenzas would not have to pay rent while Lawrence was in prison.[31]  Only once they were able to, the Semenzas would pay approximately $2,000 a month.[32]  Schaad contends that the Semenzas did in fact start paying him rent in 2018, once Schaad had exhausted his inheritance from his father and Lawrence was released, and he estimates that they transferred $168,000 in rent by the time they sold the property.[33]  But the arrangement was loose and the amount of rent per transfer varied, according to Schaad.[34]  Lawrence's transfers on the Wise app[35] from 2020

---

[28] *See, e.g.*, ECF No. 169 at 139:10–17.

[29] ECF No. 140-3 at 59:2–6.

[30] Pl. Ex. 36 at 8; ECF No. 120 at 178:12–14.

[31] *See* ECF No. 170 at 38:6–40:17.

[32] *Id.*

[33] ECF No. 169 at 220:1–19, 225:23–226:8.

[34] *Id.*

[35] "Wise" is a financial-technology platform and money-transfer service used to transfer money internationally.  *Id.* at 219:8–12.

through 2022 show that Lawrence periodically transferred Schaad irregular amounts of money ranging from $1,000 to $10,000.[36]  Several transactions show Lawrence transferring $2,000.[37]

The government offers an alternative narrative.  It contends that the defendants fabricated this landlord-tenant relationship after the fact—submitting that no history of regular rent transfers exist, that the documented transfers between the Semenzas and Schaad are large and irregular,[38] and no transfers were earmarked as rent payments.[39]  The government also notes that Schaad and the Semenzas offered inconsistent testimony about whether the Semenzas actually paid rent and, if so, the frequency, amount, and necessity.[40]

The Semenzas continued to directly pay the utility bills and property taxes after the transfer.[41]  But Schaad claims to have been reimbursing the Semenzas for these expenses until he ran out of money around 2018.[42]  In support of these reimbursements, he points to two unlabeled wire transfers totaling $18,000 that he sent to his mother in 2015 and 2016.[43]  Schaad contends that the Semenzas were meant to pay the other charges as part of the rental agreement.[44]  But when the property taxes on the property became delinquent after 2018, Lawrence used money

---

[36] *Id.* at 222:20–226:17; Pl. Ex. 21.

[37] Pl. Ex. 21.

[38] *See* ECF No. 169 at 222:20–226:17; Pl. Ex. 21.

[39] ECF No. 169 at 220:20–25.

[40] *See, e.g.*, Pl. Exs. 4 (listing rent at $2301.44), 5 (listing rent as $1000); ECF No. 140-3 at 57:19–22 (Lawrence claiming he did not pay rent); ECF No. 140-2 at 92:18–95:16 (claiming he did).

[41] *See, e.g.*, ECF No. 140-3 at 57:19–59:6.

[42] ECF No. 170 at 40:18–41:21, 44:2–11.

[43] Pl. Ex. 25.

[44] ECF No. 170 at 38:22–39:6.

from his business account to pay them.[45]  Schaad testified that he did not know of the delinquency.[46]

In June 2017, Schaad signed an agreement creating an easement with the Southern Nevada Water Authority.[47]  Schaad also signed a handwritten power of attorney at the same time, giving Lawrence power "to act in the matter of my property."[48]  Schaad contends that this was done so that Lawrence could deal with the water authority and landscapers as Schaad was living abroad.[49]  Leading up to the sale, Schaad also signed a subsequent power of attorney in 2022, giving both Semenzas "general, full, and unlimited power to do and perform all and every act and thing whatsoever requisite necessary to be done in and about the premises as fully, to all interests and purposes, as could be done if personally present."[50]  And while living in the home, the Semenzas contracted with landscapers to redo the property's landscape.[51]  Prior to the transfer, Lawrence leased solar panels on the home, and a UCC financing statement was filed in 2020 still listing Lawrence as the owner.[52]  Schaad was unaware of this contract and lien.[53]

**D.      The government filed nominee liens, and the property was sold.**

Under 26 U.S.C. §§ 6321 and 6322, the federal tax liens at issue in this case arose once the assessments against the Semenzas were made, many of which occurred before the 2015

---

[45] Joint Exs. 21, 22, 24, 26; ECF No. 169 at 147:9–151:2.

[46] ECF No. 169 at 147:9–151:2.

[47] Joint Ex. 17.

[48] Joint Ex. 31.

[49] ECF No. 169 at 159:22–160:7; ECF No. 170 at 43:9–25.

[50] Joint Ex. 31.

[51] *See* ECF No. 140-1 at 74:6–9.

[52] Pl. Ex. 8.

[53] ECF No. 169 at 146:21–147:8.

transfer to Schaad.[54]  The government recorded the restitution lien prior to the transfer, but the government did not record these tax liens against the Semenzas until after the transfer.[55]  In March 2021, believing that Schaad was holding the property as the Semenzas' nominee, the Internal Revenue Service (IRS) recorded new notices of federal tax lien, contending that Schaad only nominally owned the property.[56]  The United States Attorney's Office then mistakenly released the January 28, 2015, restitution lien in October 2021.[57]  Shortly after in 2022, Schaad transferred ownership to Shooting Gallery, LLC—an entity created by Lawrence and held by Schaad—and Lawrence proceeded to attempt to sell the home as authorized by the 2022 power of attorney.

In December 2022, the government brought this action to foreclose on the home using the tax liens recorded in 2021.[58]  During litigation, the government and Schaad entered into a stipulation and order agreeing to the sale of the property to a third-party buyer.[59]  The property was sold, and the proceeds of the sale in the amount of $654,246.73 were deposited in the court's registry.[60]

---

[54] Pl. Ex. 23; Joint Ex. 23; ECF No. 133 at 3.

[55] ECF No. 133 at 3.

[56] Joint Ex. 23.

[57] Joint Ex. 25.

[58] ECF No. 1.

[59] ECF No. 23–24.

[60] ECF No. 27–28.  A bench trial in this case originally began in October 2025.  But due to a dispute over the government's execution of a writ of *ne exeat republica* during that trial, the original judge recused, and the trial was delayed to March 2026.

**Findings of Fact and Conclusions of Law**

Because the property was sold during these proceedings, this case's posture is that of distributing the sale proceeds under 26 U.S.C. § 7403.  That statute empowers the court to "determine [the] merits of all claims" to interests in the property and to distribute "the proceeds of such sale according to the findings of the court in respect to the interests of the parties and of the United States."[61]  State law governs whether the parties have a property interest, and federal law governs whether that is taxable property within the meaning of the tax code.[62]

The government argues that it has a superior interest in all proceeds from the sale based on three theories: (1) the liens can attach to the Semenzas' equitable ownership in the home because Schaad only nominally held the property, (2) the liens are directly enforceable against Schaad because he was not a "purchaser" protected from the liens, and (3) the transfer was actually or constructively fraudulent under Nevada's fraudulent-transfer statute and the court may avoid the transfer or award a judgment for the transfer's value.[63]

Nominee and fraudulent-conveyance theories are very similar and often presented "in tandem"[64] but have "distinct elements and independent theoretical foundations"[65] and differ in focus and remedy.  "A nominee theory focuses on whether or not the taxpayer is the true beneficial owner of the property based on how the taxpayer treats the property," while "a

---

[61] 26 U.S.C. § 7403(c).

[62] *Drye v. United States*, 528 U.S. 49, 58 (1999) ("We look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien.").

[63] *See generally* ECF No. 173.

[64] Stephanie Hoffer, *To Pay or Delay: The Nominee's Dilemma Under Collection Due Process*, 82 Tul. L. Rev. 781, 816 (2008).

[65] *United States v. Holland*, 265 F. Supp. 3d 722, 727 (E.D. Mich. 2017).

fraudulent-conveyance theory looks at the conditions at the time of the conveyance and whether the transfer was affected with the intent of preventing a creditor from collecting on its interests."[66]  A nominee theory of property ownership thus states that the transfer was a "legal fiction" and equitable ownership never transferred, so the government may directly encumber that equitable ownership.[67]  A fraudulent-conveyance theory, on the other hand, avoids—or sets aside—an effectuated transfer or allows the court to award a judgment of equivalent value to the transfer.[68]

**A.    Schaad and the Semenzas did not form a nominee relationship.**

Nevada case law has referenced the nominee theory of property ownership in passing,[69] but it has not substantively developed the concept in this context.  But Nevada law does broadly recognize that property may have a legal owner and an equitable owner.[70]  For example, a trust arrangement splits the legal title and equitable ownership between the trustee and the

---

[66] *Smith v. United States*, 2007 WL 2554142, at *3 (N.D. Cal. 2007) (citing *Oxford Cap. Corp. v. United States*, 211 F.3d 280, 284 (5th Cir. 2000), and *Kirkeby v. Sup. Ct.*, 93 P.3d 395, 399 (Cal. 2004)) (cleaned up).

[67] Stephanie Hoffer, *To Pay or Delay: The Nominee's Dilemma Under Collection Due Process*, 82 Tul. L. Rev. 781, 816 (2008) ("According to the [IRS] Manual, a transfer to a nominee is merely a 'simulated transfer' that is 'not intended to divest the transferor of any rights to the property.'").

[68] *Id.* ("In contrast, a fraudulent conveyance is usually 'intended to effect an actual transfer of property or an interest in property.'").

[69] *See, e.g.*, *Paso Builders, Inc. v. Hebard*, 426 P.2d 731, 733 (Nev. 1967); *see id.* at 737 (Collins, J., concurring in part and dissenting in part) ("It is familiar practice in real estate transactions, and particularly when a purchase money mortgage is to be given, for the real purchaser to take title in the name of a nominee or 'dummy' who will execute the mortgage; thereby the real purchaser avoids personal liability for any deficiency judgment in case the mortgage is foreclosed."); *Edelstein v. Bank of New York Mellon*, 286 P.3d 249, 258 (Nev. 2012) (noting that nominee, in the context of claims involving the Mortgage Electronic Registration System, is an agency relationship).

[70] *See Wishengrad v. Carrington Mortg. Servs.*, 529 P.3d 880, 886 (Nev. 2023).

beneficiaries.[71]  In such cases, the equitable owner is the "real owner,"[72] entitling him to the beneficial interests of the property or the "profit, benefit, or advantage resulting from . . . the ownership of" the property.[73]

Although not a trust per se,[74] a nominee arrangement works similarly: the delinquent taxpayer somehow arranges for the nominee to "hold[] bare legal title to property for the benefit of [the taxpayer],"[75] while the taxpayer retains the equitable or beneficial ownership of the property.[76]  The nominee thus "has title to the [property], but the [taxpayer is] the real owner[] because [he is] entitled to the income or other benefits that the [property] yield[s]."[77]  Although a nominee arrangement may conceal ownership, it is not a viable tax-avoidance strategy because the United States Supreme Court has interpreted equitable ownership as taxable property under 26 U.S.C. § 6321,[78] so the government may directly encumber it.[79]

"Although the Supreme Court has clearly indicated that the IRS may impose nominee tax liens . . . it has provided only limited guidance concerning how such nominee determinations are

---

[71] *Id.*

[72] *Id.*

[73] *See, e.g., Acton Ltd. v. Harsh*, 4 Fed. App'x. 529, 529 (9th Cir. 2001) (unpublished) (citing Black's Law Dictionary 156 (6th ed. 1990) and *General Elec. Credit Corp. v. Andreen*, 326 P.2d 731, 733 (Nev. 1958)) (cleaned up); *Acton Ltd. v. Harsh*, 1996 WL 576995, at *4 (D. Nev. 1996).

[74] In some states, nominee theory is analyzed as an implied trust relationship.  *See, e.g., Spotts v. United States*, 429 F.3d 248, 252–53 (6th Cir. 2005); *Holman v. United States*, 505 F.3d 1060, 1068 (10th Cir. 2007); *Wilson v. United States*, 644 F. Supp. 3d 1344, 1352–53 (N.D. Ga. 2022).

[75] *Fourth Inv. LP v. United States*, 720 F.3d 1058, 1066 (9th Cir. 2013) (quoting *Scoville v. United States*, 250 F.3d 1198, 1202 (8th Cir. 2001)).

[76] *Oxford Cap.*, 211 F.3d at 284; *Holman*, 505 F.3d at 1065.

[77] *See Wishengrad*, 529 P.3d at 886.

[78] *G. M. Leasing Corp. v. U. S.*, 429 U.S. 338, 350–51 (1977); *Drye*, 528 U.S. at 56, 61; *Orme v. United States*, 269 F.3d 991, 994 n.4 (9th Cir. 2001).

[79] *Fourth Inv. LP*, 720 F.3d at 1066.

11

to be made."[80]  The Ninth Circuit has determined that state law governs the nominee determination.[81]  And Chief Judge Gordon previously decided in this case that the Nevada Supreme Court likely would apply the factors below to unearth a nominee relationship:

> (1) the source of the funds used to purchase the property;
>
> (2) the taxpayer's continued use of the property without the payment of a fair rental value;
>
> (3) the taxpayer's continued payment of maintenance charges and real estate taxes;
>
> (4) the nominees' acquisition of the property without any consideration, or for inadequate consideration;
>
> (5) the taxpayer's acts of holding himself out as the owner of the property;
>
> (6) the transfer of the property in anticipation of suit or the incurrence of liabilities by the taxpayer; and
>
> (7) the relationship between the taxpayers and the nominee, that is, whether it is a close one, such as by blood or marriage.[82]

These factors are not rigid or singularly dispositive;[83] the underlying "factual scenarios [may be] as creative and varied as [the] taxpayers themselves."[84]  Because this analysis aims to determine if the taxpayer retained equitable ownership, "the overarching consideration is 'whether the

---

[80] *Id.* at 1066–67.

[81] *Id.* at 1068.

[82] *United States v. Semenza*, 2025 WL 1432814, at *5 (D. Nev. May 16, 2025).

[83] *Spotts*, 429 F.3d at 253 n.2 ("[R]igid adherence to these factors may not be appropriate for every case."); *Fourth Inv. LP*, 720 F.3d at 1070 ("[N]o single factor is dispositive.").

[84] *Fourth Inv. LP*, 720 F.3d at 1067 n.3 (quoting Teresa Dondlinger Trissell, *A Uniform Standard for Alter Ego and Nominee Tax Litigation*, 58 Fed. Law. 38, 38 (2011)).

taxpayer exercised active or substantial control over the property.'"[85]  A nominee relationship must be proven by the preponderance of the evidence.[86]

**1.      *Factor 1 (the source of the funds used to purchase the property and factor 4 (the nominee's acquisition of the property without any consideration, or for inadequate consideration) do not support a nominee theory.***

The first and fourth factors look at the source and amount of consideration, and both are deeply disputed in this case.  Neither party denies that the amount Schaad paid ($415,715) would be adequate consideration for the property.  The government instead argues that Schaad actually provided no consideration because his decision to pay off the mortgage was a later gratuity separate from the transaction.[87]  And if it was part of the transaction, the court should infer that the Semenzas intended to secretly repay Schaad for the purchase and did so.[88]

In support of its first theory, the government argues that Schaad's payment was not legally part of the transaction.  It notes that Schaad did not assume the mortgage,[89] the supposedly unwritten land-sale agreement would be unenforceable, Schaad waited two months

---

[85] *Id.* at 1070 (quoting *In re Richards*, 231 B.R. 571, 579 (E.D. Pa. 1999)).

[86] Although the Nevada Supreme Court has not decided what evidentiary standard applies to a nominee relationship, neither party seems to dispute that preponderance of the evidence is the relevant evidentiary standard here.  The Nevada Supreme Court has also applied the preponderance standard to the similar alter ego theory, and to agency relationships generally. *Clarke v. Serv. Emps. Int'l Union*, 495 P.3d 462, 468 (Nev. 2021) (holding that alter ego liability is established by a preponderance of the evidence).

[87] ECF No. 173 at 15.

[88] *Id.*

[89] ECF No. 169 at 132:5–8

before paying off the mortgage,[90] and the Semenzas' and Schaad's testimony on whether paying off the mortgage was part of the agreement was inconsistent.[91]

In support of its second theory, the government notes that "[m]oney freely flowed between the Semenzas and their family members without any documentation" and submits that the evidence readily supports the inference of repayment.[92]  The Semenzas transferred at least $112,000 to Schaad in the past six years,[93] Lawrence paid Schaad's rent in 2022 and 2023 worth around $13,000,[94] and Schaad testified that the Semenzas' putative rent payments came out to approximately $168,000 over seven years.[95]  Lawrence also continued transferring money to Schaad after the Semenzas moved out of the home.[96]  The government further reminds the court that Romie stated in her deposition that she had a ledger documenting certain transactions to Schaad.[97]  And during discovery, Chief Judge Gordon issued a sanction that the finder of fact may infer that Romie "destroyed the ledger with which she recorded certain transfers of inheritance money to . . . Schaad and that the ledger may have been unfavorable to the defendants."[98]

---

[90] Joint Ex. 10.

[91] Because Lawrence refused to testify in this trial, the government requests that the court presume Lawrence's testimony would've been unfavorable to him.  ECF No. 173 at 21.  I do not find, however, that the presumption would alter any of the court's findings.

[92] ECF No. 173 at 15.

[93] ECF No. 169 at 220:1–6.

[94] ECF No. 170 at 15:18–18:19.

[95] ECF No. 169 at 220:1–19, 225:23–226:8.

[96] *Id.* at 226:20–227:5; Pl. Ex. 21.

[97] ECF No. 173 at 15.

[98] ECF Nos. 74, 75.

Schaad disagrees with these characterizations.  He argues that he paid "$415,715 with his own funds to pay off the property's mortgage in exchange for ownership of the property" and this "represents valuable consideration."[99]  He notes that it is undisputed that the transfer came from a Swiss bank account in his name,[100] and he purchased the property from the Semenzas with the funds he had received from his father's inheritance.[101]  Schaad backs that up with his father's will showing that he indeed inherited more than sufficient funds for the purchase around that time.[102]  He also rejects the notion that the Semenzas repaid him for the mortgage, arguing that the government is only speculating.

Overall, I find that these two factors substantially favor Schaad.  It is undisputed that Schaad transferred the money from his own account and that he had the financial means to do so.  I reject the government's theory that the payment of the mortgage was an unrelated gratuity.  Schaad offers a plausible explanation for the delay, and while the parties might not have structured the unwritten transaction correctly, it is reasonable that they would forego a written contract and other formalities given that the transaction was between close family members.  Substance, not form, determines tax consequences.[103]

I also reject the government's theory that the Semenzas repaid Schaad as too speculative.  While the government established that some money did flow between the two, it has not shown

---

[99] ECF No. 172 at 19 (cleaned up).

[100] Joint Ex. 10.

[101] ECF No. 169 at 117:11–25; ECF No. 170 at 30:10–31:5.

[102] Joint Ex. 1.

[103] *Church of Scientology of Cal. v. Comm'r*, 823 F.2d 1310, 1319 (9th Cir. 1987) ("In enforcing federal tax laws, courts look to the substance of a transaction rather than its form."); *Lopez v. Lopez*, 541 P.3d 117, 126 (Nev. Ct. App. 2023) (noting, in analyzing transaction in a divorce proceeding, that "[f]unction takes precedence over form").

that the Semenzas repaid Schaad for the entirety of the mortgage.  The evidence at trial showed that, over many years, the Semenzas transferred between $112,000 and $168,000 to Schaad.  But the logical jump from those many years of transfers to the conclusion that the Semenzas repaid Schaad the entire mortgage amount is too big, even with the spoliation presumption.

### 2.    *Factor 2 (the taxpayer's continued use of the property without the payment of a fair rental value) is neutral.*

While the parties agree that the Semenzas continued to live on the property and eventually transferred Schaad money, they disagree on whether there was a landlord-tenant relationship and whether the payments were rent.  Schaad testified that he "allowed the Semenzas to live in the [p]roperty without any rent payment for a few years," but "[t]he Semenzas paid Schaad rent payments beginning in approximately 2018 until the Semenzas moved out of the property in 2022."[104]  Schaad attributes the two years of nonpayment to Lawrence's incarceration and his need to reestablish himself once released.[105]

At trial, the government had Schaad review a list of Lawrence's Wise transactions, which shows sporadic payments to Schaad ranging from $1,000 to larger payments of $7,500 and $10,000 during the time the Semenzas lived in the home.[106]  The Wise transfers also show that Lawrence wired $2,000 on several occasions.[107]  Schaad testified that some of these transactions were rent (or back rent) payments.[108]  Schaad stated that the payments were irregular amounts

---

[104] ECF No. 172 at 18.

[105] ECF No. 170 at 38:6–19.

[106] Pl. Ex. 21; ECF No. 169 at 223:23–226:17.

[107] Pl. Ex. 21.

[108] ECF No. 169 at 224:15–19.

because Lawrence's income from legal work was also irregular, but the funds that he received average around $2,000 a month, and he estimates that he received a total amount of $168,000.[109]

The government contends that Schaad and Lawrence's testimony regarding rent is a "post hoc attempt[] to manufacture a legitimate landlord-tenant relationship—through wildly shifting and contradictory testimony regarding 'rough estimates' or 'helping out'"— and it fails to support this factor.[110]  The government points out that Schaad and the Semenzas never prepared a written lease.[111]  And Lawrence's statements regarding rent payments were inconsistent in frequency, amount, and necessity,[112] including stating several times that he lived in the home rent free.[113]  Romie also stated that she never paid rent.[114]  The government further points out that no consistent payments were documented,[115] and Schaad never reported rental income.[116]

The Ninth Circuit considered this factor in *Fourth Investment LP v. United States*, which provides some guidance.[117]  The delinquent taxpayers and the purported nominee in that case had a rental agreement,[118] but the taxpayers did not start paying rent until nearly a year after entering the lease, rent was almost never paid on time or paid in full, and the nominee never objected.[119]  The Ninth Circuit found that the taxpayer's payments to the nominee were not rent

---

[109] *Id.* at 218:19–226:8.

[110] ECF No. 173 at 15.

[111] *See, e.g.*, ECF No. 169 at 127:1–11.

[112] *See, e.g.*, Pl. Exs. No. 5, 4.

[113] *See, e.g.*, ECF No. 140-3 at 57:19–22, 58:4–5.

[114] ECF No. 140-1 at 46:12–18.

[115] ECF No. 170 at 73:7–20.

[116] ECF No. 169 at 143:2–6.

[117] *Fourth Inv. LP*, 720 F.3d at 1063.

[118] *Id.*

[119] *Id.*

but payments to cover various property expenses as they arose.[120]  The *Fourth Investment* court found that this factor favored the government because "the taxpayers benefitted from a leasehold relationship in which they could ignore key terms of the lease, such as rent payment, without consequence."[121]

The testimony on rent in this case is indeed inconsistent, and the Semenzas' arrangement shares many ostensible similarities with that in *Fourth Investment*.  But the Wise transfers seem to corroborate that payments did occur, and nothing plainly suggests these payments were something else like in *Fourth Investment*.  Rather, the payments seem wholly consistent with Schaad being a poor and passive landlord, so I credit Schaad's contention that he received rent and some beneficial interests from the property.  And the government's suggestion that these payments were secretly covering other expenses or a repayment scheme is speculative.  But the timing and amount of these transactions are varying and irregular, suggesting that the Semenzas were at least benefiting from Schaad being an absentee landlord.  So I find that this factor is neutral.

### 3.   The Semenzas' control of the property minimally favors the government's position.

The government also uses this factor to highlight the control that the Semenzas exercised over the property.  Schaad signed two separate powers of attorney giving the Semenzas significant power over the property.  Without Schaad's knowledge or permission, the government contends, the Semenzas contracted to redo the property's landscape[122] and they

---

[120] *Id.*

[121] *Id.* at 1071–72.

[122] Pl. Ex. 7; ECF No. 140-1 at 74:6–9; ECF No. 140-2 at 153:5–159:16; ECF No. 169 at 146:21–147:8.

continued to lease solar panels in Lawrence's name.[123]  The government notes that Romie stated in her deposition that changing the landscape was her decision,[124] and a UCC financing statement regarding the solar panels with Lawrence's name was filed in 2020.[125]  The government also points out that the Semenzas oversaw the transfer of title to Shooting Gallery and managed the listing and sale of the property.[126]

Schaad counters that the Semenzas' "possession or control" was not any different than a typical tenant's "possession or control" of a property.[127]  And Schaad attributes the broad powers of attorney to him living abroad in Switzerland, while the Semenzas were on-site and could more easily manage the property.[128]  Schaad also points out that he signed an agreement creating an easement with the Southern Nevada Water Authority in June 2017 as part of the landscaping project,[129] and he testified that the landscaping change was his idea.[130]

The specific examples of control that the government offers are not particularly probative.  The solar-panel contract predates the transfer,[131] and the UCC financing statement could have been filed without Lawrence's involvement.[132]  It also appears that Schaad was at

---

[123] Pl. Exs. 7, 8.

[124] ECF No. 140-1 at 74:6–9.

[125] Pl. Ex. 8.

[126] ECF No. 169 at 166:7–23, 191:2–192:8.

[127] ECF No. 172 at 15.

[128] *Id.* at 7 n.4, 9.

[129] Joint Ex. 17; ECF No. 170 at 42:3–5.

[130] ECF No. 170 at 74:2–4.

[131] Pl. Ex. 7.

[132] *See* Nev. Rev. Stat. § 104.9509(2) ("By authenticating or becoming bound as debtor by a security agreement, a debtor or new debtor authorizes the filing of an initial financing statement.").

least somewhat involved in the landscaping project because he signed the easement document related to it.

Purchasing a home and allowing a parent or child to live there is also a common and legitimate arrangement. And it is not unreasonable for someone living in a foreign country to delegate home management to the home's tenants. So I find that the Semenzas' management of the property does favor the government but is not particularly probative because "the alleged nominee and the alleged true beneficial owner have the type of relationship where both individuals would . . . normally be expected to simultaneously act as true owners."[133]

### 4.     *Factor 3 (the taxpayer's continued payment of maintenance charges and real estate taxes) favors the government.*

The parties similarly dispute who paid the property's expenses. The government posits that the "Semenzas continued to make payment of all the expenses associated with the [h]ome after the transfer, such as water, gas, sewer, pest control, pool services, landscaping, and electricity, again without a written agreement for them to do so."[134] The Semenzas also continued to pay the property taxes after the transfer, including several years of delinquent taxes.[135] Schaad was unaware of the delinquency.[136]

Schaad testified that the Semenzas paid these expenses under their purported rental agreement, but he reimbursed them for many of these expenses such as improvements to the property's landscaping, real estate taxes, and a homeowner's insurance policy until he ran out of

---

[133] *Spotts*, 429 F.3d at 253 n.2.

[134] ECF No. 173 at 16.

[135] Joint Exs. 21, 22, 24, 26.

[136] ECF No. 169 at 147:9–151:2.

money.[137]  Schaad explains that he did not have a bank account in the United States so he would transfer money to his mother who would then use those funds to pay for many of the expenses.[138]  Romie's bank-account statements show two unlabeled wire transfers from Schaad totaling $18,000 sent in 2015 and 2016.[139]  Schaad claims that these are reimbursements.[140]  But he concedes that he stopped reimbursing the Semenzas after 2018.[141]

I find that this factor favors the government.  It's undisputed that the Semenzas completely paid for at least some of the expenses.  Although Schaad points to transfers that he suggests are reimbursements, he does not link the unlabeled transactions to any expenses.

### 5. *Factor 5 (the taxpayer's acts of holding himself out as the owner of the property) weakly favors the government.*

The government insinuates that Lawrence represented himself as the owner while trying to sell the property, noting that he was the point of contact and seemed to manage the sale.  The government also identifies instances in which Lawrence seemingly represented himself as the property's owner.  It points to the UCC financing statement for the solar panels recorded in 2020 in Lawrence's name,[142] and Lawrence's debtor examination in which he said he owned the house before "he caught himself" and said Schaad owned it.[143]

---

[137] ECF No. 170 at 40:18–41:6.

[138] *Id.* at 40:18–41:21, 44:2–11.

[139] *See* Pl. Ex. 25.

[140] ECF No. 172 at 8.

[141] See ECF No. 170 at 40:18–21; Joint Ex. 26.

[142] Pl. Exs. 7, 8.

[143] ECF No. 140-3 at 60:3–5.

Schaad points out that the transfer was public, and he was recorded as the legal owner before the transfer to Shooting Gallery.[144]  Schaad also notes that the realtor managing the sale testified that she understood that Schaad ultimately owned the property.[145]  So I find that this factor favors Schaad.  The instances that the government points to seem minimal.  And Lawrence managing the sale and serving as point of contact is logical given that Schaad lived in Europe.

### 6.   Factor 6 (the transfer of the property in anticipation of suit or the incurrence of liabilities by the taxpayer) strongly favors the government.

Semenza transferred the property within two weeks of sentencing and the court imposing restitution.  The government argues that "[t]his timing shows a clear attempt by [Lawrence] to try to game the system by purporting to transfer the property after sentencing was complete but before the [restitution] lien was filed."[146]  Schaad counters that "the IRS did not record any tax lien on the property until after Schaad's purchase," and that "Schaad was unaware of the [restitution] lien."[147]  But he offers no explanation for the otherwise expedited timeline.

The government also challenges Schaad's motivation for buying the home and creating this putative landlord-tenant relationship.  "[I]f the motivation for the transfer was really to allow [Romie] a place to live while [Lawrence] was in prison for 18 months, Schaad could have simply made the monthly mortgage payments and sought repayment later, without the need to transfer title to him, or for him to pay off the mortgage entirely."[148]  The government also notes that "the Semenzas themselves had more than enough funds to cover the monthly mortgage payments for

---

[144] ECF No. 172 at 19.

[145] *See* ECF No. 170 at 113:10–14.

[146] ECF No. 173 at 18.

[147] ECF No. 172 at 19 (cleaned up).

[148] ECF No. 173 at 16.

18 months,"[149] including a recent $1 million payment in 2013 related to Lawrence's work and $156,000 liquidated from a retirement account at the time he went to prison.

So I find that this factor strongly favors the government.  The timing and unorthodox manner in which the house was transferred—with no inspection, appraisal, title company, or public records search—belie Schaad's contention that this was a normal transaction with two weeks between the initial proposal and the transfer.  I also credit the government's theory that the transfer was made to beat the government's imposition of restitution and tax liens, and the transfer was timed as to not affect Lawrence's sentencing.  Schaad's purported motivation for purchasing the home is also shaky, considering that the Semenzas had more than sufficient assets and funds to continue to pay the mortgage.

### 7.    *The totality of the factors weighs against a nominee relationship.*

While the evidence in this case is close, I find that the government has not met its burden to show that Schaad was a nominee and that the Semenzas retained equitable ownership of the property such that a nominee lien could encumber it.  Although the transaction seems wholly intended to frustrate tax collection and outrun the imposition of tax liens, "[t]he ultimate inquiry is" not necessarily fraud or fraudulent intent but "whether the taxpayer has engaged in a legal fiction by placing legal title to property in the hands of a third party while actually retaining some or all of the benefits of true ownership."[150]  For example, at the most favorable end to the government, the timing, motivation, and close family relationship in this case bear the hallmarks

---

[149] *Id.*

[150] *Holman*, 505 F.3d at 1065; *Fourth Inv. LP*, 720 F.3d at 1070 ("[T]he overarching consideration is "whether the taxpayer exercised active or substantial control over the property."); *Smith*, 2007 WL 2554142, at *3 ("Fraud is not necessarily required to prove a nominee theory.").

of a classic nominee case.[151]  But these factors seemingly reflect an intent to frustrate tax collection rather than the Semenzas retaining equitable ownership of the home.

The factors more probative of equitable ownership seem to tilt away from Schaad being a nominee and suggest there was more heft to this transaction than just the transfer of bare legal title.  For instance, Schaad's decision to pay off the mortgage for a substantial sum strongly militates against a nominee finding.  While this factor is not always dispositive of a nominee relationship,[152] the decision to pay off the mortgage and for substantial consideration distinguishes this case from a typical nominee one.[153]  The Semenzas' purported rent payments also do not resemble a nominee relationship because the transfers were roughly appropriate for rent and evidence corroborates that Schaad was actually receiving payments while the Semenzas lived in the home.  The government has not met its burden of showing otherwise.

In sum, I don't believe that Schaad was a nominee rather than an absentee landlord.  For seemingly dubious reasons, Schaad purchased the home with his own money and acquired actual ownership rather than just bare legal title.  Schaad seemingly retained some beneficial interests

---

[151] The parties agree that the close-family-relationship factor favors the government.

[152] *Fourth Inv. LP*, 720 F.3d at 1070–71.

[153] The court's review of applicable authority found few cases in which the government asserted a nominee theory against a putative nominee who paid substantial, valuable consideration.  In those cases, the court generally rejected the nominee theory.  *United States v. Holland*, 953 F.3d 397, 400 (6th Cir. 2020) ("All three theories fail as a matter of law for the reasons that the district court said they did: namely, that Holland received adequate consideration for his transfer of the royalty assets to the partnership in the 1998 transaction, and that the government otherwise lacks evidence that the transfer of those assets was made with the goal of thwarting the government's ability to collect on its assessments against Holland."); *Wilson*, 644 F. Supp. 3d at 1358  (finding that government failed to prove nominee theory because the putative nominee "alone incurred the purchase money mortgage to purchase the Property, and she paid the Property expenses from her own bank account"); *United States v. Kudasik*, 21 F. Supp. 2d 501, 509 (W.D. Pa. 1998) ("[Transferee] provided a fair consideration for the property and there are no indicia of [transferor's] continued enjoyment of the property after he conveyed his undivided one-half interest.").

24

in the property or its "income or other benefits"[154] because the evidence suggests that Schaad, and not the Semenzas, would've been the ultimate beneficiary of the home's appreciation and any rent. And for those same reasons, I am not convinced that the Semenzas were equitable owners. Schaad, perhaps unwisely, delegated significant control of the property to the Semenzas and was an absentee landlord. But that doesn't necessarily indicate equitable ownership in this case because it does appear that they paid him, and Schaad had some legitimate reasons and motivations for giving that control because he lived in Europe. I thus conclude the government did not prevail on its nominee theory.

**B.      The government's subsequent-purchaser and constructive-fraud theories fail.**

As a consequence of the finding that Schaad paid adequate consideration, the government's subsequent-purchaser and constructive-fraud claims also fail. Constructive fraud requires, among other things, that the transferor did not receive "a reasonably equivalent value in exchange for the transfer or obligation."[155] And an unrecorded lien—as these liens were at the time of the transfer—is not enforceable against third parties who paid "[a]dequate and full consideration" and did not otherwise have notice.[156] Both theories depend on the transferee paying inadequate consideration. But because Schaad paid adequate consideration, these theories cannot prevail.

**C.      The government has proven that the transfer was actually fraudulent.**

These findings, however, do not foreclose the government's recovery. Nevada has adopted the Uniform Fraudulent Transfer Act (UFTA). Its drafters designed the UFTA to

---

[154] *Wishengrad*, 529 P.3d at 886.

[155] Nev. Rev. Stat. § 112.180(1)(b).

[156] 26 U.S.C. §§ 6323(a), (h)(6).

"prevent a debtor from defrauding creditors by placing the subject property beyond the creditors' reach."[157]  The act empowers a court to avoid a transfer or award a judgment if the debtor transferred property "[w]ith actual intent to hinder, delay or defraud any creditor of the debtor"[158] or "[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation."[159]

Other jurisdictions including California,[160] federal courts in this district,[161] and treatises treat these statutory factors as disjunctive, as Nevada seems to,[162] and thus recognize that "the focus is on the transferor's intent, not the adequacy of the consideration or the financial condition

---

[157] *Herup v. First Boston Fin., LLC*, 162 P.3d 870, 872 (Nev. 2007).

[158] Nev. Rev. Stat. § 112.180(1)(a).

[159] Nev. Rev. Stat. § 112.180(1)(b).

[160] *See Lyons v. Sec. Pac. Nat'l Bank*, 48 Cal. Rptr. 2d 174, 185 (Cal. Ct. App. 1995) ("Subdivision (a) is independent of section (b) and does not require proof of anything more than actual intent to defraud."); *Matter of Xonics Photochemical, Inc.*, 841 F.2d 198, 202 (7th Cir. 1988) ("And, even if the consideration is adequate, the conveyance is fraudulent if made with intent to defraud creditors."); *Com. Credit Counseling Servs., Inc. v. W.W. Grainger, Inc.*, 840 N.E.2d 843, 852 (Ind. Ct. App. 2006) ("[A]ctual intent to hinder or delay a creditor is enough to render a transfer fraudulent.  For this reason, we need not perform an analysis of whether a reasonably equivalent value was received for the transfer.").

[161] *S. New England Tel. Co. v. Sahara & Arden, Inc.*, 2010 WL 2035330, at *3 (D. Nev. 2010) ("[W]here actual intent to defraud creditors is proven, the conveyance will be set aside regardless of the adequacy of consideration exchanged."); *Henry v. Rizzolo*, 2012 WL 1376968, at *5 (D. Nev. 2012) (citing *Great Neck Plaza, L.P. v. Le Peep Rests., L.L.C.*, 37 P.3d 485, 492 (Colo. App. 2001)) (holding if "the plaintiff proves actual intent to defraud, the conveyance will be set aside regardless of whether the debtor received reasonably equivalent value," and noting, for example, "because the statute 'reads in the disjunctive,' a plaintiff can prove a fraudulent transfer either by showing actual fraud or by showing constructive fraud" under the Colorado Uniform Fraudulent Transfer Act).

[162] *See Herup*, 162 P.3d at 873 (recognizing that NRS 112.180(1)(a) and NRS 112.180(1)(b) create different theories of liability).

26

of the transferor."[163]  Thus, an intent to frustrate creditors alone is sufficient under the UFTA for an actually fraudulent-conveyance claim even if the parties exchanged adequate consideration.[164] Given that Nevada's fraudulent-transfer statute should be interpreted "to conform to other states' interpretations of their respective versions of" the UFTA,[165] a fraudulent intent alone is sufficient here.

A finding of fraudulent intent may be based on circumstantial evidence because "direct proof of fraudulent intent is rarely available,"[166] and "it will be the rare case in which the debtor testifies under oath that he or she intended to defraud creditors."[167]  Nevada's fraudulent-transfer statute codifies eleven traditional 'badges of fraud" that a court may consider to determine whether someone acted with actual intent to defraud:

(a)  The transfer or obligation was to an insider;

(b) The debtor retained possession or control of the property transferred after the transfer;

(c) The transfer or obligation was disclosed or concealed;

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(e) The transfer was of substantially all the debtor's assets;

---

[163] Michael I. Saltzman & Leslie Book, IRS Practice and Procedure ¶ 17.04 ("For purposes of Section 7 of the UFCA, the focus is on intent, not the adequacy of the consideration or the financial condition of the transferor as it is under Section 2 for constructive fraud.").

[164] *See e.g.*, *Lyons*, 48 Cal. Rptr. 2d at 185.

[165] *Herup*, 162 P.3d at 876.

[166] *In re Slatkin*, 525 F.3d 805, 812 (9th Cir. 2008).

[167] *In re Nat'l Audit Def. Network*, 367 B.R. 207, 219 (Bkrtcy. D. Nev. 2007); Michael I. Saltzman & Leslie Book, IRS Practice and Procedure ¶ 17.04 ("[F]raudulent intent . . . is difficult" to prove, so courts came to recognize "circumstantial evidence from which an intent to defraud could be inferred, called badges of fraud.").

(f) The debtor absconded;

(g) The debtor removed or concealed assets;

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; and

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.[168]

### 1.      *Lawrence transferred the property with fraudulent intent.*

Although Schaad paid consideration for the property, that payment is not dispositive of this claim.  Unlike a nominee theory, which focuses on the transferor's relationship to the property, actual fraudulent transfer focuses on the transferor's intent.[169]  So a transfer may be actually fraudulent even with adequate consideration if the transferor acted with the requisite intent.

For many of the reasons explained *supra*, this court has no trouble concluding that Lawrence transferred the property with the intent to frustrate creditors.  As Lawrence's stepson, Schaad is unquestionably an insider.  Lawrence retained possession as he continued to live in the home, and he retained significant control of the property.  The transfer happened within two

---

[168] Nev. Rev. Stat. §§ 112.180(2)(a)–(k); *Semenza*, 2025 WL 1432814, at *6.  The government in its briefing suggests that there is some uncertainty on whether "preponderance of the evidence" or "clear and convincing evidence" is the relevant evidentiary standard for this claim.  ECF No. 173 at 19 n.93 (citing *In re Miomni Gaming Ltd.*, 2025 WL 2382314, at *14 (Bankr. D. Nev. Aug. 15, 2025), and *In re Beverly*, 374 B.R. 221, 235 (B.A.P. 9th Cir. 2007)).  I do not resolve that issue because the government has met its burden under either standard.

[169] *See Smith*, 2007 WL 2554142, at *3 (citing *Oxford Cap.*, 211 F.3d at 284 and *Kirkeby*, 93 P.3d at 399).

weeks of Lawrence's sentencing,[170] which allowed him to transfer the property without affecting sentencing, and it was seemingly in anticipation of the government imposing sizeable tax and restitution liens on him.  I credited the government's theory that Lawrence did so to beat the clock on the imposition of those liens.  Although the then-encumbered home was not a significant portion of the Semenzas' assets given the mortgage lien on it, transferring it did prevent the government from encumbering his equity in it and allowed it to continue to appreciate.  And the reasons that the Semenzas and Schaad offered for the transfer at the time, primarily the Semenzas' inability to pay the mortgage,[171] are dubious in light of Lawrence receiving $1 million a little over a year earlier.[172]

Schaad's payment of consideration and the other factors loosely favoring him do not outweigh the badges of fraud suggesting the Semenzas' fraudulent intent—as it did with the nominee analysis given the different focuses.  I thus conclude that Lawrence acted with fraudulent intent and that the transfer was actually fraudulent.

### 2. Schaad is not entitled to the good-faith defense.

A creditor cannot recover under an actually fraudulent-conveyance theory if the transferee acquired the property in good faith and for a reasonably equivalent value.[173]  But to prove good faith, the transferee must show that "the facts would [not] have caused a reasonable transferee to inquire into whether the transferor's purpose in effectuating the transfer was to delay, hinder, or defraud the transferor's creditors."[174]  As the UFTA's commentary explains,

---

[170] Joint Ex. 3; ECF No. 169 at 124:17–125:24; ECF No. 170 at 31:23–33:24.

[171] ECF No. 140-3 at 59:2–6.

[172] Pl. Ex. 36 at 8; ECF No. 120 at 178:12–14.

[173] Nev. Rev. Stat. § 112.220.

[174] *Herup*, 162 P.3d at 875; *MOH Mgmt., LLC v. Michelangelo Leasing, Inc.*, 2019 WL 1437136, at *3 (Nev. 2019) (unpublished) (quoting *Herup*, 162 P.3d at 876) (noting that, "to prove good

"[k]nowledge of the facts rendering the transfer voidable would be inconsistent with the good faith that is required of a protected transferee."[175]  Schaad contends that he was a good faith purchaser here.  But Schaad was on constructive notice of Lawrence's fraudulent intent because the government recorded the restitution lien before the transfer.  Schaad also knew that Lawrence owed a significant amount of taxes, that Lawrence had pled guilty to tax crimes and recently been sentenced, and that the IRS could seize homes to satisfy tax liability.  So Schaad had reason to know the transfer was fraudulent, and he cannot avail himself of the good-faith transferee defense.

**D.    The court awards the government the excess equity and the amount the Semenzas purportedly paid in rent.**

Nevada's fraudulent-transfer statute "sets forth remedies for a fraudulent transfer."[176]  The "court may void the transfer and return the title to the debtor."[177]  The court may also issue a judgment equivalent "to the value of the asset at the time of the transfer, subject to adjustment as the equities may require," or "the amount necessary to satisfy the creditor's claim, whichever is less."[178]

*1.    The property was an asset.*

Schaad contends that even if the transfer was fraudulent and he did not act in good faith, the government is still not entitled to anything.  He theorizes that the property had no value at the

---

faith, the transferee must show that "'he or she did not know or had no reason to know of the transferor's fraudulent purpose to delay, hinder, or defraud the transferor's creditors.'").

[175] Unif. Fraudulent Transfer Act § 8.

[176] *Tahican, LLC v. Eighth Judicial Dist. Court in & for Cnty. of Clark*, 523 P.3d 550, 554 (Nev. 2023).

[177] *Id.* (citing 37 Am. Jur. 2d Fraudulent Conveyances and Transfers § 116 (2015)).

[178] Nev. Rev. Stat. §§ 112.220(2)–(3).

time of the transfer because an "asset," as Nevada's fraudulent-transfer statute defines it, does not include "[p]roperty to the extent it is encumbered by a valid lien."[179]  No evidence, he contends, shows that the property's value exceeded the balance due on its 2007 mortgage note. He also speculates that the home was even underwater at the time due to the intervening 2008 financial crisis.

But I find that the record contains sufficient evidence that the equity of the home at the time of the transfer exceeded the encumbrances and that the evidence preponderates in favor of it.  Lawrence estimated the home to be worth approximately $450,000 around the time of the transfer,[180] the mortgage valued the home at $460,200 several years earlier,[181] and Schaad's underwater theory is too speculative.  So I find that there was an "asset" the IRS could've reached in 2015 but for the transfer.

### 2.    *The court awards the government a judgment of $406,531.73.*

After finding a transfer fraudulent, the court may award a judgment equal to the asset's value at the time of the transfer "subject to adjustment as the equities may require."[182]  It does not appear Nevada has definitively spoken on how this section limits damages.[183]  But the fraudulent-transfer statute's purpose is to return the parties to "their pre-transfer position."[184]

---

[179] Nev. Rev. Stat. § 112.150(2)(a).

[180] ECF No. 120 at 218:15–19.

[181] *See* Joint Ex. 12.

[182] Nev. Rev. Stat. §§ 112.220(2)–(3).  The court may also issue a judgment for "the amount necessary to satisfy the creditor's claim" if it is less than the amount transferred.  Nev. Rev. Stat. § 112.220(2).

[183] *See Herup*, 162 P.3d at 876 n.25 ("[W]e need not address the proper measure of damages allowable for a fraudulent transfer under NRS 112.220(3).").

[184] *Cadle Co. v. Woods & Erickson, LLP*, 345 P.3d 1049, 1053 (Nev. 2015).

31

The UFTA's commentary recognizes that "[c]ircumstances may require a departure from measur[ing]" recovery by the "value of the asset . . . at the time of the transfer."[185]

At the time of the transfer, the excess equity in the property would've been worth approximately $45,000 at most. But nothing indicates the government would've foreclosed on the Semenzas' principal residence for equity worth a fraction of the liens, rather than allow the home to appreciate.[186] And had Lawrence not transferred his home, the liens would've more than covered any excess equity obtained from the 2023 sale. So I find that the circumstances and equities favor awarding the government the equity in excess of the mortgage, which is $238,531.73.[187]

I also increase this sum by the amount the Semenzas purportedly paid in rent to Schaad.[188] The transfer allowed the Semenzas to effectively pay rent to Schaad instead of

---

[185] Unif. Fraudulent Transfer Act § 8 cmt. 3 ("The measure of the recovery of a defrauded creditor against a fraudulent transferee is usually limited to the value of the asset transferred at the time of the transfer. . . . The premise of § 8(c) is that changes in value of the asset transferred that occur after the transfer should ordinarily not affect the amount of the creditor's recovery. Circumstances may require a departure from that measure of the recovery"); *United States v. Verduchi*, 434 F.3d 17, 23 (1st Cir. 2006) ("The UFTA commentary itself only says that the transfer should not 'ordinarily' affect the amount of the recovery. This statement is consistent with the approach taken under the earlier Uniform Fraudulent Conveyance Act (UFCA); even under the predecessor UFCA, courts had carved out equitable adjustments. It was for that reason that the explicit equitable adjustment language was added to the successor UFTA.").

[186] *United States v. Aultman*, 2006 WL 544401, at *3 (W.D. Pa. 2006) ("[T]here is no requirement that the Internal Revenue Service . . . take immediate action to foreclose upon the lien.").

[187] *Verduchi*, 434 F.3d at 22 (holding "that there was nothing impermissible about" using the court's equitable authority under Rhode Island's enactment of UFTA to award the current market value of a property despite it likely exceeding the value of the asset at the time of the transfer).

[188] *Id.* at 24 ("That equitable discretion can surely be used to avoid an unfair windfall to a not-so-innocent transferee at the expense of an undersecured creditor. That is particularly so when the undersecured creditor is the federal government."); *United States v. Patras*, 544 F. App'x 137, 146 (3d Cir. 2013) (unpublished) (holding that the district court did not abuse discretion in adjusting damage award to include amount the transferor paid to transferee as part of the transaction).

paying down the mortgage, which made his payment to live in the property inapplicable against the government's liens. So I additionally award the government the amount the Semenzas purportedly paid (or should have paid) in rent of $168,000. I thus determine that the government would've been entitled to a $406,531.73 judgment, and I distribute the proceeds accordingly under Section 7403. I find that Schaad is entitled to the remainder of $247,715.

## Conclusion

Based on these findings of fact and conclusions of law, IT IS ADJUDGED THAT **the United States is entitled to judgment in its favor on its actual-fraudulent-conveyance theory in the amount of $406,531.73. Schaad is entitled to the remainder of $247,715. The government is entitled to 62.14% of the interest and Schaad is entitled to 37.86% of the interest.** The Clerk of Court is directed to **release the funds from the court's registry** and **distribute the proceeds accordingly**.

**The Clerk of Court is directed to ENTER FINAL JUDGMENT in favor of the plaintiff and against the defendants and CLOSE THIS CASE.**

_____
U.S. District Judge Jennifer A. Dorsey
June 15, 2026

33